**CITY OF GOLDEN, a Colorado municipal corporation, Plaintiff,**

v.

**Hal D. SIMPSON, in his official capacity as Colorado State Engineer, and Richard L. Stenzel, in his official capacity as Division Engineer for Water Division No. 1, and the Farmers High Line Canal and Reservoir Company, Defendant.**

**No. 02SA364.**

Supreme Court of Colorado, En Banc.

Jan. 12, 2004.

Rehearing Denied Feb. 2, 2004.

Porzak Browning & Bushong LLP, Glenn E. Porzak, Steven J. Bushong, P. Fritz Holleman, Boulder, Colorado, Attorneys for Appellant.

Ken Salazar, Attorney General, Lori J. Coulter, Assistant Attorney General, Denver, Colorado, Attorneys for Appellee Hal D. Simpson.

The Law Offices of Brice Steele, P.C., Brice Steele, Brighton, Colorado, Carlson, Hammond & Paddock, L.L.C., Mary Mead Hammond, Lee H. Johnson, Karl D. Ohlsen, Denver, Colorado, Attorneys for Appellee Farmers High Line Canal and Reservoir Company.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

In this water case, the State Water Engineer ordered the City of Golden to stop diverting water from Clear Creek at the Church Ditch during a river call in the drought year of 2002. Golden sought to prevent enforcement of the order by immediately moving for a temporary restraining order ("TRO"), a preliminary injunction, and a permanent injunction against the state. The state, in turn, orally requested an injunction to enforce its cease-and-desist order. After a full-day hearing, the water judge held that

Golden did not have a valid right to the water it had been diverting at the Church Ditch and ordered Golden to comply with the state's order to enforce the conditions of a 1966 change of water right decree. Consequently, the judge denied the TRO and dismissed Golden's request for preliminary and permanent injunctions.

Golden makes two arguments as to how the water court erred. First, Golden claims that it has valid rights to the water, and should not have had to stop diverting. Second, Golden asserts that regardless of the merits, the court prematurely dismissed the case after simply holding a hearing on the TRO, and instead should have conducted another hearing involving the permanent injunction.

We reject both of Golden's arguments. The 1966 change decree that established Golden's rights is unambiguous and, under it, Golden does not have rights to the water it claims. Consequently, the water court was correct in dismissing Golden's complaint.

## II. Facts and Procedural History

On Friday, September 6, 2002, the Division Engineer for Water Division No. 1 issued a cease-and-desist order directing the City of Golden to stop diverting water from Clear Creek under its Oulette Ditch Priority No. 5. The Division Engineer issued the order after concluding that Golden was in violation of a 1966 change decree. This change decree resulted when, in 1966, Golden obtained permission to move a very senior water right approximately six miles up Clear Creek from its original point of diversion and change the use of the water from irrigation to municipal.

Prior to 1966, Golden held irrigation water rights to divert 6.69 cubic feet per second ("cfs") from Clear Creek at the Oulette Ditch headgate, which is located several miles downstream from Golden. This was a very senior water right dating back to May 31, 1860. Golden, however, needed water for municipal uses, and needed the water much farther upstream where its municipal intake site was located. Consequently, the water

court entered a change decree imposing certain conditions on Golden. This decree reduced Golden's rights from 6.69 cfs to 3.42 cfs to reflect historical beneficial use, moved the diversion point six miles upstream to the Church Ditch, and changed the use to municipal.

The decree confirmed a settlement agreement Golden negotiated with other water right holders on this stretch of Clear Creek. Farmers High Line Canal and Reservoir Company ("FHL") was one of these holders. It held water rights that entitled it to divert 44.4 cfs at the Farmers High Line Canal ("FHL Canal"), which intersects with Clear Creek between the Church and Oulette Ditches. Golden's Priority No. 5 was senior to many of FHL's rights, and so, before 1966, if Golden did not have 6.69 cfs available at Oulette Ditch during the irrigation season, it could put a call on the river and limit the amount of water that FHL and others diverted upstream.

The FHL Canal, however, is several miles upstream from Oulette Ditch, and historically there has typically been water entering and leaving Clear Creek between the FHL Canal and the Oulette Ditch.[1] Thus, even when FHL diverted all of the available water at the headgate of the FHL Canal, there was frequently sufficient water for Golden to divert 6.69 cfs at the Oulette Ditch headgate. Consequently, Golden's right was often satisfied from sources below the FHL Canal, and FHL was free to divert water at the FHL Canal without regard to Golden's more senior right.

In the attempt not to harm other appropriators, paragraph 7(e) of the 1966 change decree sought to recreate the pre-change relationship between FHL and Golden. If conditions on Clear Creek were such that Golden would not have had to call for FHL's water absent the change decree, Golden was prohibited from taking water from FHL after the change decree as well. Specifically, paragraph 7(e) said that when water flowing at the Oulette Ditch was 3.5 cfs or greater—

---

1. In addition to the evidence introduced at the hearing below, see *Farmer's High Line Canal and Reservoir Co. v. Wolff,* 23 Colo.App. 570, 131 P. 291 (1913), for an historic description of the water use and return flows on Clear Creek.

sufficient to satisfy Golden's *new* volume at its *prior* point of diversion—and when Clear Creek did not have enough water to satisfy both Golden's and FHL's rights, Golden must stop diverting water at the Church Ditch.[2] These two requirements were intended to mitigate the harm from moving Golden's point of diversion from several miles downstream from the FHL Canal to just upstream from the FHL Canal. If there was at least 3.5 cfs at the Oulette Ditch headgate, Golden's new rights were effectively subordinated to FHL's. At all other times, Golden's Priority No. 5 continued to be senior.[3] Under these terms, FHL would not be harmed by Golden's change of the point of diversion.

In mid-July of 2002, during a severe drought, there was not sufficient water at the FHL headgate to satisfy FHL's water rights. Consequently, it placed a call on Clear Creek. Although FHL was using all of the water available at the FHL headgate, inflows downstream from the FHL Canal provided approximately 5–10 cfs at the Oulette Ditch headgate. In August, FHL obtained data revealing that Golden was exercising its Priority No. 5 despite FHL's call and the 5–10 cfs flow at the Oulette Ditch headgate.

FHL reported to the Division Engineer that Golden was in violation of the 1966 change decree. After discussing the situation with Golden twice in two weeks, the Division Engineer issued the cease-and-desist order of September 6, 2002. The cease-and-desist order demanded that Golden stop diverting at the Church Ditch by 12:01 am on Sunday, September 8, 2002. Golden did not comply, but immediately filed a motion for a temporary restraining order, a motion for preliminary injunction, and a complaint for injunctive relief to prevent the state from enforcing its order.

Monday, September 9, the Water Court for Water Division No. 1 held a hearing on Golden's motion for a temporary restraining order. The hearing lasted all day, and addressed two issues: whether Golden had a legally enforceable right to continue its diversion, and if so, whether Golden would suffer immediate and irreparable injury if forced to stop diverting water from Clear Creek.

Based on testimony at the hearing, and on his interpretation of the 1966 decree, the water judge held that Golden did not have a legally enforceable right to continue diverting water. Consequently, the judge denied Golden's motions for a temporary restraining order and preliminary injunction, and dismissed Golden's complaint for injunctive relief. The judge further ordered Golden to comply with the state's cease-and-desist order. Golden appealed directly to the Supreme Court as required by section 13–4–102(1)(d). § 13–4–102(1)(d), 5 C.R.S. (2003); § 37–92–304(9), 10 C.R.S. (2003).

## III. Analysis

The City of Golden, the petitioner, makes two arguments. First, it claims that the water court was incorrect when it employed the plain language of the 1966 change decree to hold that Golden did not have a valid right

---

2. Paragraph 7(e) of the 1966 change decree states, in full:
 > As to the Farmers Highline Canal, the above mentioned Priority No. 5 shall be exercised by the City of Golden only at times such that its use will not result in a call at the headgate of the Farmers Highline Canal on the No. 5 and 9 direct rights divertible at said headgate. Diversions by the Farmers Highline Canal, under its Priority No. 5 right shall not be diminished by pro-rating with the Priority 5 right of the City of Golden. These limitations are effective when the flow at the present Oulette headgate exceeds 3.5 cfs. When the flow at the present location of the Oulette headgate is less than 3.5 cfs, the Priority No. 5 right of the City of Golden may be exercised against the Priority No. 9 right of the Farmers Highline Canal by the difference between the actual flow at the present location of the Oulette Ditch headgate

 and 3.5 cfs, or said difference shall be pro-rated between the Priority No. 5 right of the City of Golden and the Priority No. 5 right of the Farmers Highline Canal. Subject to the rights of Petitioner to contest diversion by the Farmers Highline Canal on its No. 9 Priority out of storage season, and without any admission by Petitioner of any right to so divert.

3. Golden's right was scaled so that it could only divert water in the amount that Clear Creek's flow at the Oulette Ditch fell below 3.5 cfs. For example, if Clear Creek's flow at Oulette was 3 cfs, Golden could divert 0.5 cfs, and if Clear Creek's flow at Oulette was 2 cfs, Golden could divert 1.5 cfs. If the flow at Oulette was zero, Golden could divert all 3.42 cfs of its Priority No. 5 right.

to 3.42 cfs of Priority No. 5 water when two conditions were met: over 3.5 cfs of water was flowing at the Oulette Ditch headgate, and FHL had a call on Clear Creek. Second, Golden argues that the water court erred when it dismissed Golden's complaint for injunctive relief without a separate hearing on the matter.

We reject both arguments. Although the City of Golden offers several creative interpretations of the 1966 change decree, we agree with the water judge that the terms are clear: Golden does not have the right to divert water from Clear Creek when the two conditions are satisfied, and in this case they were. Because the decree is clear on its face, no extrinsic evidence is admissible to alter its plain meaning.

We also hold that the water judge acted within his discretion when he dismissed Golden's motion for a preliminary injunction and its complaint for injunctive relief after just one hearing. At the TRO hearing, the water judge stated that he would hear evidence on the merits of the case if time permitted, and indeed all of the parties presented expert testimony regarding the merits. At the end of the hearing, Golden's attorney told the judge that he knew of no additional evidence that he would present at a subsequent hearing. After the hearing, the judge decided that Golden did not have a legal right to the Priority No. 5 water and could not prevail. Therefore, he properly ordered Golden to comply with the state's cease-and-desist order and dismissed Golden's complaint.

In the following sections, we examine each of Golden's arguments in greater detail.

## A. The Change Decree

This case requires us to interpret a change decree. When a holder of a decreed water right wishes to transfer its rights to another party, or move the point of its diversion up- or down-stream, or alter the destination or use of the water, the holder must petition the water court. *See* § 37–92–302(1)(a), 10 C.R.S. (2003); *Empire Lodge Homeowners'*

*Ass'n v. Moyer*, 39 P.3d 1139, 1149 (Colo. 2001).[4] If the affected parties negotiate an acceptable solution, the court may issue a change decree making the agreement official; if not, the change case proceeds to trial. *See generally* § 37–92–304, 10 C.R.S. (2003).

Before issuing a change decree, the water court must ensure that it is crafted in such a way as to prevent injury to other water users; if that is not possible, the water court must deny the application. § 37–92–305(3), 10 C.R.S. (2003); James N. Corbridge Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 246 (rev. ed.1999). When examining the question of injury, the court assumes that appropriators have a right to the stream conditions as they existed at the time of the appropriation. *Santa Fe Trail Ranches Prop. Owner's Ass'n v. Simpson*, 990 P.2d 46, 57–58 (Colo.1999); *Handy Ditch Co. v. Louden Irrigating Canal Co.*, 27 Colo. 515, 518, 62 P. 847, 848 (1900).

If the parties affected by the change cannot reach an acceptable agreement, the water court decides what conditions are necessary to protect against injury to other water rights. § 37–92–305(3), 10 C.R.S. (2003); *De-Herrera v. Manassa Land & Irrigation Co.*, 151 Colo. 528, 530, 379 P.2d 405, 407 (1963). As an example, some change decrees limit the amount of water diverted, some limit the timing or season of diversion, and others limit the amount consumed. § 37–92–305(4). These conditions attempt to ensure that the other appropriators' rights will continue to be satisfied to the degree that they were satisfied in the past. § 37–92–305(3).

Once a change is adjudicated, courts consider the matter fully litigated, and will not reopen a final case in order to alter or add to the terms of the decree. *See generally Farmers High Line Canal & Reservoir Co. v. City of Golden*, 975 P.2d 189 (Colo. 1999). A change decree includes a specified period of retained jurisdiction to address injurious effects that may result from placing the change of water right into operation.

---

4. Although the Water Right Determination and Administration Act, which contains § 37–92–302, was passed in 1969, the law requiring adjudication of changes has remained predominately the same since 1899. James N. Corbridge Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 269 (rev. ed.1999).

*Farmer's Reservoir and Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 811–12 (Colo.2001).

 Courts interpret a stipulated change decree as they would interpret a contract. *USI Props. East v. Simpson*, 938 P.2d 168, 173 (Colo.1997). A court's primary goal is to implement the intent of the parties as expressed in the language of the decree. *Id.* To ascertain this intent, the courts turn to the plain and ordinary meaning of its terms. *Id.* If the terms are clear, a court will neither look outside the four corners of the instrument, nor admit extrinsic evidence to aid in interpretation. *Id.* Disagreement between the parties involved does not necessarily indicate that the documents are ambiguous. *Id.* Instead, the court must adopt the plain and generally accepted meaning of the words employed. *Id.* If the contract involved is a stipulation, such as this change decree, any party that participated in the original stipulation is proscribed from introducing legal contentions contrary to the plain meaning of the decree. *Id.* This approach lends consistency and stability to Colorado water law and decrees.

In this case, we must construe Golden's 1966 change decree. This decree came about in response to Golden's request to move its point of diversion approximately six miles upstream on Clear Creek, and to change the use from seasonal irrigation to year-round municipal. The change decree lists eleven parties (including FHL) that may have been injured by the change, but then goes on to list several conditions with which Golden was required to comply in order to mitigate such harm. At the time of the decree, all parties stipulated that the conditions in the decree would prevent injury to Clear Creek appropriators.

The change decree contained three relevant types of conditions. First, Golden was required to abandon 3.27 cfs of the 6.69 cfs that it had been previously entitled to divert.[5] Second, Golden's Priority No. 5 rights were deemed junior and subordinate during the winter, non-irrigating months as compared to some of the other rights on Clear Creek. Third, Golden was prohibited from diverting water when certain parties placed a call on the stream, but only if there was at least 3.5 cfs flowing in Clear Creek at the Oulette Ditch headgate. According to the change decree, if Golden adhered to these conditions, Golden's change of the diversion point and the change from irrigation to municipal purposes would not injure any other appropriators.

In the case at hand, Farmers High Line Canal and Reservoir Company and the State and Division Engineers claim that Golden is in violation of the third type of condition, specifically paragraph 7(e), of the change decree. Golden insists that it is not. Paragraph 7(e) states, in relevant part:

> As to the Farmers Highline Canal, the above mentioned Priority No. 5 shall be exercised by the City of Golden only at times such that its use will not result in a call at the headgate of the Farmers Highline Canal on the No. 5 and 9 direct rights divertible at said headgate.... These limitations are effective when the flow at the present Oulette headgate exceeds 3.5 cfs.

Paragraph 12 of the change decree states that "[w]herever the word 'flow' is used in connection with said headgate points, it shall mean the total flow of Clear Creek."

The parties agree that at the time the Division Engineer ordered Golden to stop diverting at the Church Ditch, FHL had a call at the headgate of the FHL Canal, and the total flow of Clear Creek at the Oulette headgate exceeded 3.5 cfs.[6] The State and Division Engineers and FHL contend that these facts satisfied the prerequisites in paragraph 7(e) and that Golden was required

---

5. Witness DiNatale, the Water Resources and Treatment Manager for the City of Westminster, testified that Golden was required to relinquish 3.27 cfs to reflect its historical use. Golden had previously been entitled to irrigate 299 acres during irrigation season (the summer). After the change, the rights were municipal and year-round.

6. At oral arguments, Golden argued that it had not had a chance to present evidence on the matter; however, at trial, Golden's witness agreed that "[t]he fact is, there is always now more than 3.5 cfs at the Oulette Ditch headgate."

to stop diverting water under Priority No. 5. Golden, however, argues that the decree is ambiguous, and that the two prerequisites were not actually satisfied.

We review a lower court's interpretation of a contract *de novo*. *Lake Durango Water Co., Inc. v. Pub. Utils. Comm'n,* 67 P.3d 12, 20 (Colo.2003). Paragraph 7(e) clearly says that if FHL has a call at the FHL Canal headgate on Clear Creek, *and* if the total flow of Clear Creek at the Oulette Ditch headgate is at least 3.5 cfs, then Golden must stop diverting its 3.42 cfs at the Church Ditch. Any other interpretation of paragraph 7(e) reads language into the decree that does not exist. Because both parties agree that FHL had placed a call at the FHL Canal, and also that the total flow of Clear Creek was in excess of 3.5 cfs at the Oulette Ditch, the water judge was correct in holding that Golden had no right to divert water and was thus also justified in dismissing Golden's complaint for injunctive relief.

Golden, however, offers novel interpretations of paragraph 7(e) in an attempt to demonstrate that the decree is ambiguous. We are not persuaded, but we briefly address each of Golden's arguments. First, Golden argues that the language in the change decree saying that Golden may divert water "only at times such that its use will not result in a call" should be interpreted to mean that Golden should only be required to stop diverting "when, *but for* Golden's diversions under the No. 5 right, the FHL No. 9 would not be calling"—in other words, when the available water at the FHL Canal is within 3.42 cfs of FHL's total appropriation of 44.4 cfs. Golden claims that this is the only time that its use "result[s]" in an FHL call as required by the change decree. The parties refer to this theory as the "cusp" interpretation. According to Golden's cusp theory, when FHL has access to 44, 43, 42, or 41 cfs of its total 44.4 cfs rights (and the flow at Oulette is over 3.5 cfs), Golden must stop diverting. But according to Golden, if FHL's supply drops to 40.98 cfs or below, then Golden may continue diverting.

Golden's interpretation does not adhere to the intent of the parties. We know that the parties intended that the change decree would not injure the appropriators on Clear Creek, including FHL: paragraph 7 of the decree states that "the granting of the change of point of diversion requested by Petitioner will not injuriously affect the vested rights of any of the protestants, or others, provided that the Petitioner ... be required to comply with the following conditions and limitations ...." and then goes on to list the conditions, including the one that Golden disputes herein.

Prior to the change decree, when there was not sufficient water for FHL at the FHL Canal, but there was sufficient water for Golden at the Oulette Ditch, two conditions would be true: FHL would be calling for water, and Golden would not. Therefore, despite the fact that Golden's Priority No. 5 was senior to most of FHL's rights, Golden would *not* have to supercede FHL's junior rights, and because its point of diversion was downstream from FHL, Golden would not be taking any of the water destined for the FHL Canal.

The change decree must be interpreted to effectuate the intent stated within the four corners. After the change decree, if FHL calls and the specified flow occurs at the Oulette Ditch, Golden cannot be allowed to decrease the amount of water available at the FHL Canal. This is true whether there is 4, 40, or 44 cfs available to FHL. Golden's interpretation of the "result[s] in a call" language leads to absurd results. Golden's taking 3.42 cfs of FHL's water is no less harmful to FHL if FHL has 40.98 cfs than if it has 41 cfs.

At the TRO hearing, Golden presented witnesses who claimed that interpreting the "result[s] in a call" language to encompass *all* times that FHL had a call on Clear Creek would render Golden's rights junior and subordinate to FHL's, and that had the drafters meant to do this, they would have explicitly used the words "junior and subordinate" as they did in some of the other sections. Golden further argued that making Golden's rights essentially junior and subordinate to FHL's rights would be an unfair windfall to FHL.

We are not persuaded. The other paragraphs in the change decree that contain the "junior and subordinate" language require that Golden stop diverting water if some other appropriator places a call on Clear Creek during the non-irrigation season. Prior to the change decree, Golden would not have been using water during the winter months; consequently, after the change decree, Golden is required to stop diverting water during the winter months if another appropriator needs that water. This is a different situation from that described in paragraph 7(e). Under paragraph 7(e), Golden must stop diverting only at intermittent times when the two specified conditions are satisfied. Moreover, paragraph 7(e) is more complex than the other paragraphs: as the flow at Oulette rises above 0 cfs, Golden must ratchet down its use. When the flow is 1.0 cfs, Golden may take 2.5 cfs; when the flow is 2.0 cfs, Golden may take 1.5 cfs. Ultimately, when the flow at Oulette is 3.5 cfs, Golden must cease diverting at Church Ditch. Because of this complexity and level of negotiated detail, the drafters avoided the "junior and subordinate" language used in other paragraphs of the decree and instead used specific language regarding how the decree would operate.

Golden's next argument concerns the second requirement from paragraph 7(e): "these limitations are effective when the flow at the present Oulette headgate exceeds 3.5 cfs." Golden argues that in this sentence "flow" should only include water that is available for diversion, and should not include any water that is scheduled for delivery to downstream users. In support of this argument, Golden seeks to introduce extrinsic evidence to show that Clear Creek now carries imported water and storage releases that it did not carry at the time of the change decree. Golden also argues that it is standard practice for the State Engineer's office to exclude this scheduled water from the amounts available for diversion.

Typically, parties that import water have rights superior to the rights of other appropriators in regards to the imported water. *See City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 66 n. 59 (Colo.1996).

The 1966 change decree, however, defines "flow" as "the total flow of Clear Creek." Although we have already decided that this language is plain on its face, and that no extrinsic evidence should be admitted to alter this plain meaning, we briefly address Golden's argument. Even if we assume, without deciding, that Golden is correct in saying that the conditions in Clear Creek have changed, and that the State Engineer's office typically excludes water that is scheduled for delivery from the available flow, we would still reject Golden's argument.

By 1966, the doctrine of foreign water was already well-developed. In 1898, this court said that appropriators are "entitled to the use of the water of [a] stream to the extent that by their efforts and expenditures they ... increased its average, continuous flow...." *Platte Valley Irrigation Co. v. Buckers Irrigation, Milling Improvement Co.,* 25 Colo. 77, 82, 53 P. 334, 336 (1898); *see also Comrie v. Sweet,* 75 Colo. 199, 201, 225 P. 214, 214 (1924). In 1951, we held that "appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed." *Brighton Ditch Co. v. City of Englewood,* 124 Colo. 366, 377, 237 P.2d 116, 122 (1951).

These precedents demonstrate that as of 1966, the principle that some tributary water, such as imported water, was not subject to Colorado's appropriation system was commonly recognized. This water was designated for the importer even if there were appropriators with senior rights on the stream. Because imported water was a familiar concept at the time of the change decree, the water lawyers who drafted the document could be expected to incorporate the concept into their definition of "flow". Instead of excluding imported water or water already scheduled for delivery to a downstream user, however, the drafters explicitly defined the "flow" as the "total flow of Clear Creek." Hence, we cannot now amend the definition.

Finally, Golden argues that the state's historical interpretation of the change decree demonstrates that Golden should not have to stop diverting at Church Ditch. Golden asserts that at no time since 1966, even during

droughts in 1977, 1978, and 1981, did the state ever order Golden to stop diverting. Golden claims that during some of this time FHL placed a call on Clear Creek, and the flow at Oulette Ditch exceeded 3.5 cfs.

This argument also requires extrinsic evidence, which we have already rejected. Even if we were to allow this evidence, however, FHL witnesses at the TRO hearing testified that Golden had not provided the Division Engineer with accurate measurements of the amount of water it was diverting until 2000, so until that time, the Engineer had no data upon which to curtail Golden's diversion. Furthermore, the drought of 2002 was remarkably severe, and the lack of enforcement of the decree's conditions in the past cannot be dispositive of the 2002 situation.

In conclusion, Golden's various interpretations of the 1966 change decree and attempts to introduce extrinsic evidence are ineffective because the decree is plain on its face. The water judge was correct in deciding that the decree requires Golden to cease and desist diverting water under its Priority No. 5 rights at the Church Ditch whenever: (1) FHL makes a call at the FHL Canal headgate, and (2) the total flow at the Oulette Ditch headgate is greater than 3.5 cfs. This interpretation satisfies the intent of the parties to prevent the change decree from injuring users of Clear Creek water.

## B. The Procedure

Golden's second challenge to the water court's decision is procedural. Golden argues that the water judge erred when he dismissed Golden's complaint for injunctive relief after just one hearing. We disagree.

On Monday, September 8, 2002, just two and one-half days after being served with the cease-and-desist order, the City of Golden filed a motion for a temporary restraining order, a motion for preliminary injunction, and a complaint for injunctive relief with the Division No. 1 Water Court. With its motions, Golden hoped to temporarily or permanently prevent the Division Engineer from enforcing the state's cease-and-desist order.

The purpose of a temporary restraining order ("TRO") is to prevent "immediate and irreparable harm" to one of the parties in a lawsuit. *Mile High Kennel Club v. Colo. Greyhound Breeders Ass'n,* 38 Colo. App. 519, 559 P.2d 1120, 1121 (1977). A court may grant a TRO without notice to the party to be restrained. C.R.C.P. 65(b). Due to the powerful nature of TROs, they are short in duration (no more than ten days), and may only be issued upon a strong showing that specific immediate and irreparable harm will occur absent the order. *McLean v. Farmers High Line Canal & Reservoir Co.,* 44 Colo. 184, 195, 98 P. 16, 20 (1908).

To obtain a longer-lasting temporary order, a party may move for a preliminary injunction. A preliminary injunction is designed to preserve the status quo or protect rights pending the final determination of a cause. *Id.* Like a TRO, its purpose is to prevent irreparable harm prior to a decision on the merits of a case. *Combined Communications Corp. v. City and County of Denver,* 186 Colo. 443, 447, 528 P.2d 249, 251 (1974). The moving party must satisfy six factors to obtain a preliminary injunction: a reasonable probability of success on the merits; a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; lack of a plain, speedy, and adequate remedy at law; no disservice to the public interest; balance of equities in favor of the injunction; and, the injunction will preserve the status quo pending a trial on the merits. *Rathke v. MacFarlane,* 648 P.2d 648, 653–54 (Colo. 1982). A permanent injunction, on the other hand, requires success on the merits of the case.

In a water case, if a water user refuses to comply with a State or Division Engineer's cease-and-desist order, the state may move for an injunction to prohibit further use. § 37–92–503(1)(a), 10 C.R.S. (2003). The ensuing trial is referred to as a "503 hearing" in reference to section 37–92–503, which sets forth the procedure surrounding the hearing, the criteria for the injunction, and the penalties for violating the injunction. To prevail, the state must prove that "the water is being applied to a beneficial use," and that "the diversion is causing or will cause injury to

persons owning, or entitled to use water under, water rights having senior decreed priorities." § 37–92–503(2).

If the court issues the injunction to enforce the Water Engineer's order, the water user must pay court costs and reasonable attorney fees. *Id.* Furthermore, if the water user proceeds to disregard the injunction, the user is in contempt of court and is subject to treble damages and attorney fees. § 37–92–503(4); § 37–92–504. When the Engineer files for an injunction under section 503, the water court must accelerate the case, place it above other water matters, and then render a decision at the conclusion of the hearing. § 37–92–503(1)(c). Time is of the essence.

In this case, instead of awaiting the Engineer's section 503 motion to enforce his cease-and-desist order, Golden took the offensive and immediately filed for a TRO, a preliminary injunction, and a permanent injunction. In response to Golden's filings, the water court promptly scheduled a hearing beginning Monday morning following the Friday cease-and-desist order. The plaintiff at the hearing was the City of Golden, and the defendants were: the State and Division Engineers, the Farmers Highline Canal and Reservoir Company, the Farmers Reservoir and Irrigation Company, the City of Arvada, the City of Thornton, the City of Westminster, the Coors Brewing Company, and Wannamaker Ditch Company.

At the hearing, the attorney for the State and Division Engineers orally moved for an injunction and enforcement under section 37–92–503. The judge expressed his intent to address the question of the TRO. He went on to say that he would "move on to the other issue concerning the injunction asked for by the State, if time permits, and if the parties have been adequately notified."

The parties proceeded to call witnesses and present evidence. Golden called two witnesses: Gary Thompson, who was the president of a water resources engineering company, and who had worked with Golden since 1985; and Dan Hartman, the Director of Public Works for the City of Golden. Golden's witnesses testified not only as to the immediate and irreparable harm that the cease-and-desist order allegedly would cause to Golden, but also to the merits of the case—the proper interpretation of the 1966 change decree.

In response, the state called Richard Stenzel, the Division Engineer for Division No. 1. The City of Westminster called Kelly DiNatale, the Water Resources and Treatment Manager for the City of Westminster, and Michael Happe, a Senior Water Resources Engineer for the City of Westminster. Finally, Coors called Neal Jaquet, the Director of Water Resources at Coors. These witnesses also testified extensively as to the proper interpretation of the 1966 change decree.

After the full-day trial, including eight parties and six expert witnesses, the court denied the TRO. In so ruling, the water judge explained that he decided two issues. The first, the "main issue" according to the judge, was the "effect of the decree, particularly paragraph 7(e) of the decree," and "whether the ultimate result of that decree ... is that Golden has an enforceable right against Farmers High Line Canal ... under its call." Then, the judge said, if Golden "survive[d] that hurdle," the court would address the question of immediate and irreparable harm.

After a recess and closing arguments, in which six attorneys reinforced their own interpretations of the change decree, the judge rendered his opinion from the bench. He said that before turning to the question of immediate and irreparable harm, he must "determine whether [Golden had] a legally enforceable right in this particular case in order for this court to order that they be permitted to continue their diversion."

In his ruling, Judge Hays rejected the "cusp" interpretation, saying that it "doesn't make sense" and that the "language [of the change decree] is straightforward and unambiguous, and [he was] not going to attempt to apply some other of Golden's creative interpretations to the language of 7(e)." Thus, the judge found that the first condition for enjoining Golden was met—Golden's water use resulted in an FHL call. The judge next ruled that the second condition was also met because there was 3.5 cfs flowing at the Oulette headgate. Ultimately, the judge

found "that Golden has not established its right to continue diverting ... because the conditions set forth in the '66 decree prevent it from doing so."

In conclusion, Judge Hays said that Golden "bargained away a lot of rights in transferring its diversion from downstream at the Oulette headgate upstream to the Church Ditch, but what it bargained and gave away, it has to live with from this point forward.... [Golden's motion for a] temporary restraining order shall be denied." Later that afternoon, the judge issued a written order requiring Golden to comply with the state's cease-and-desist order, and also dismissing Golden's complaint for injunctive relief.

 Golden argues that even if the judge correctly denied the TRO, he should not have dismissed Golden's complaint for injunctive relief. First, Golden claims, a hearing on the merits of the case was necessary. We disagree. The water judge heard extensive evidence from five expert witnesses regarding interpretation of the 1966 change decree. Then, when the water judge asked whether Golden would have any additional evidence to present at a hearing on the merits, Golden's attorney responded: "I'm not sure there would be any, Your Honor," thus agreeing that no additional hearing was necessary.

When water rights are in dispute, and one party is not receiving its entitled allotment, time is of the essence. That is why section 37–92–503 requires the water court to expedite a 503 hearing and decide the case at the conclusion of the hearing. This case offers similar concerns. FHL was not receiving the water to which it was entitled. Golden continued diverting water despite FHL's call and the state's cease-and-desist order. When the court decided, as a matter of law, that Golden was not entitled to the 3.42 cfs of water that it continued to divert, the court properly dismissed Golden's case and upheld the cease-and-desist order.

Moreover, the hearing addressed more than simply the TRO. At the beginning of the hearing, the judge notified the parties that he might reach the merits of the case, specifically the 503 injunction requested by the state. Then, at the hearing, all parties introduced evidence on the merits. At the end of the hearing, Golden's attorneys told the water judge that they had no further evidence to offer at trial. Hence another hearing would have been pointless.

Golden now argues that in a subsequent hearing it would have offered extrinsic evidence showing that the flows at the Oulette Ditch comprised water scheduled for delivery to downstream users, and was not available for diversion. Golden also claims that it would have shown that return flows from the FHL Canal were not sufficient to meet Golden's 3.5 cfs at the Oulette Ditch. Having determined that the 1966 change decree was unambiguous, however, the water court properly denied a motion for reconsideration based on this extrinsic evidence. This extrinsic evidence is irrelevant because the 1966 change decree plainly defines "flow" to be the total amount of water flowing in Clear Creek at the Oulette Ditch. The only relevant flow is total flow, and even after subsequent investigation, Golden does not assert that the total flow was less than 3.5 cfs. The amount of water promised to downstream users, or the amount that came from return flows below the FHL Canal is irrelevant.

We hold that the judge followed proper procedure. He heard the relevant evidence offered by the parties on the matter in dispute—Golden's water rights under the 1966 change decree. In his written order, he ordered Golden to comply with the state's cease-and-desist order, thus granting the state's 503 motion.[7] Because Golden's complaint for injunctive relief and the state's request for 503 injunctive relief were two sides of the same coin, it would be impossible to grant both. Therefore, when the judge granted the state's injunction against Golden, the judge properly and necessarily dismissed Golden's complaint against the state.

7. The judge's order said in relevant part: "The court held a hearing on Golden's Motion for Temporary Restraining Order and ruled at the conclusion of evidence that Golden was not entitled to injunctive relief and must comply with the Cease and Desist Order served upon it by the State Engineer's Office. Thus the court dismisses Golden's complaint."

## IV. Conclusion

We affirm the water court's interpretation of Golden's 1966 change decree. The decree plainly requires Golden to cease diverting water under its Priority No. 5 rights from Church Ditch when two conditions are satisfied: FHL has a call on Clear Creek, and the total flow of Clear Creek at the Oulette Ditch exceeds 3.5 cfs. The evidence supports the water court's decision that these two conditions were satisfied and Golden did not have a valid right to the Priority No. 5 water under the circumstances of FHL's call. Thus, the water court properly dismissed Golden's complaint for injunctive relief in a prompt and efficient matter.