**CHEROKEE METROPOLITAN DISTRICT, Applicant/Appellant**

**v.**

**Harold D. SIMPSON, Colorado State Engineer; Colorado Ground Water Commission; and Upper Black Squirrel Creek Ground Water Management District, Objectors/Appellees**

**and**

**Steven J. Witte, Division Engineer, Water Division 2, Engineer Pursuant to C.A.R. 1(e).**

**No. 06SA95.**

Supreme Court of Colorado, En Banc.

Nov. 27, 2006.

Grimshaw & Harring, P.C., Wayne B. Schroeder, Jody Harper Alderman, Carrie S. Bernstein, Denver, Colorado, Attorneys for Applicant/Appellant.

John W. Suthers, Attorney General, Jennifer Mele, Assistant Attorney General, Water Rights Unit Natural Resources and Environmental Section, Denver, Colorado, Attorneys for Objectors/Appellees Colorado Ground Water Commission and the State Engineer.

Lind, Lawrence & Ottenhoff, LLP, Richard T. LiPuma, P. Andrew Jones, Windsor, Colorado, Attorneys for Objectors/Appellees

Upper Black Squirrel Creek Ground Water Management District.

Justice HOBBS delivered the Opinion of the Court.

In this appeal from a judgment of the court for Water Division No. 2,[1] the parties contest the meaning of a stipulated decree provision contained in a conditional water rights diligence decree issued by the court on March 8, 1999. The parties to the agreement are Cherokee Metropolitan District ("Cherokee"), the Upper Black Squirrel Creek Ground Water Management District ("the Management District"), the State Engineer, the Division Engineer for Water Division No. 2, and the Colorado Ground Water Commission.

The stipulated decree provision concerns Cherokee's use of two sets of wells in the Upper Black Squirrel Creek Designated Ground Water Basin ("the Designated Basin") known as the Cherokee Wells 1–8 ("Wells No. 1–8") in the northern part of the Designated Basin and the Sweetwater Wells in the southern part of the Designated Basin. Although the water involved is designated groundwater, the water judge retains jurisdiction over the conditional water rights proceedings in this case pursuant to our decision in *Sweetwater Development Corp. v. Schubert Ranches, Inc.*, 188 Colo. 379, 384, 535 P.2d 215, 218–19 (1975)(holding that the water judge for Water Division No. 2 has continuing jurisdiction over conditional decree proceedings in this case, because the claim had been filed in an adjudication proceeding prior to creation of the Designated Basin and proof was introduced showing that the applicant was entitled to a conditional decree prior to the time of the designation and creation of the Designated Basin).

---

1. The issues that Cherokee Metropolitan District presents for review are:

   1. Whether the water court erred by ordering that Cherokee may use Wells 1–8 to supply water outside the Upper Black Squirrel Creek Designated Ground Water Basin only for the purpose of emergency and backup when its Sweetwater Wells are unable to produce a sufficient supply of water "to meet the commitments that existed at the time the parties entered the Stipulation."

2. Whether the water court erred by failing to address Cherokee's claim that the State Engineer is estopped from asserting its present argument because Cherokee relied on the State Engineer's statements prior to the fall of 2004, that permitted Cherokee to use Wells 1–8 for deliveries outside the Upper Black Squirrel Creek Designated Ground Water Basin.

The meaning of the stipulated decree provision is before us on appeal because the water judge denied Cherokee's motion to enforce the meaning it ascribes to the parties' 1999 agreement. The provision at issue states:

Cherokee shall use Cherokee Wells No. 1–8 only for supplying in-basin beneficial uses that discharge any unconsumed water back into the Upper Black Squirrel Designated Basin and for emergency and back-up purposes. Emergency and backup use shall include the inability to get sufficient supply from the Cherokee owned Sweetwater wells.

Finding it to be ambiguous and hearing extrinsic evidence to assist in ascertaining the intent of the parties to the agreement, the water judge construed this stipulated decree provision to provide that Wells No. 1–8 may be used to supply water outside of the Designated Basin only for emergency and backup purposes when its Sweetwater Wells are unable to produce a sufficient supply of water to meet the commitments that existed at the time the parties entered into this stipulation. We agree, and affirm the water court's judgment.

## I.

Cherokee is a metropolitan district[2] that currently supplies water to approximately 5,250 homes and 350 commercial businesses in an area east of Colorado Springs. The boundaries of this district include lands within the Designated Basin and lands outside of the Designated Basin. Cherokee's water supply includes Wells No. 1–8 in the northern part of the Designated Basin and the Sweetwater Wells in the southern part of the Designated Basin.

The Colorado Ground Water Commission entered an order designating the Upper Black Squirrel Creek Basin on May 1, 1968. The Upper Black Squirrel Management District was created in 1979. The source of supply for Wells No. 1–8 and the Sweetwater

conditional water rights is within the Designated Basin and the Management District.

The March 1999 decree of the water court contains a finding of due diligence for the ten Sweetwater conditional water rights Cherokee obtained from its predecessors-in-interest. The court incorporated the parties' agreement into this diligence decree. The agreement defines how waters from Wells No. 1–8 and the Sweetwater Wells will be diverted and utilized for beneficial use as part of Cherokee's water supply.

The diligence decree allows water from the Sweetwater Wells to be utilized within and outside of the Designated Basin. The decree limits diversions utilizing the ten conditional Sweetwater Well rights to 6,258 acre feet per year.

The decree limits Wells No. 1–8 to beneficial uses within the Designated Basin that discharge any unconsumed water back into the Designated Basin. The two exceptions to this in-basin restriction allow water from Wells No. 1–8 to be utilized outside the basin for "emergency and backup purposes" that "include the inability to get sufficient supply from the Cherokee owned Sweetwater wells."

At the time the parties entered into the January 1999 stipulation that led to entry of the March 1999 diligence decree, Cherokee water supply commitments outside of the Designated Basin totaled no more than 2,683 acre feet per year delivered to an area known as Cimarron Hills. Cherokee expected the Sweetwater Wells to produce in excess of 6,000 acre feet per year; this is reflected in a decree condition that limits the ten conditional Sweetwater Well rights to no more than 6,258 acre feet of diversion per year. Wells No. 1–8 produce 1,886 acre feet of water per year.

Because of rapid growth occurring in Cherokee's service area after the 1999 diligence decree was entered, current Cherokee commitments outside of the Designated Basin require a supply of up to 5,000 acre feet of water annually.

---

**2.** A metropolitan district is a quasi-municipal corporation that provides any two or more services to a political subdivision, including among other services, water or sanitation. §§ 32–1–103(10),(20), C.R.S. (2006). Metropolitan water districts are organized to "benefit municipalities by providing adequate supplies of water for domestic use." § 32–4–401(1)(d), C.R.S. (2006).

The water court found that it is possible to obtain 3,407 acre feet per year from the existing Sweetwater Wells. Cherokee contended that the existing Sweetwater Wells can produce only 2,400 acre feet per year.[3] Cherokee has concluded that it is not worthwhile to install the remaining three wells. Cherokee asserts that the groundwater resource is simply too unproductive at the site.

The combination of Cherokee's increased customer base outside the Designated Basin and the disappointing productivity of the Sweetwater Wells has led Cherokee to assert that the 1999 agreement allows it to use Wells No. 1–8 as a primary source of supply outside the Designated Basin because the Sweetwater Wells have turned out to be insufficient to meet its customer demands. The Management District and the State Engineer contest Cherokee's construction of the parties' agreement.

To test its view of the agreement's meaning, Cherokee filed its "Motion for Court Order Requiring the Colorado State Engineer to Abide by Previous Stipulation of the Parties" with the water court on April 1, 2005. Determining the agreement to be ambiguous and employing the aid of extrinsic evidence taken at a two-day trial at which the parties produced documentary and testimonial evidence, the water court construed the provision's meaning adversely to Cherokee's contention.

## II.

The water judge construed the stipulated decree provision in this case to provide that Wells No. 1–8 may be used to supply water outside of the Designated Basin only for emergency and backup purposes when its Sweetwater Wells are unable to produce a sufficient supply of water to meet the commitments that existed at the time the parties entered into this stipulation. We agree, and affirm the water court's judgment.

3. According to Cherokee, "you can't pump these wells 24/7.... You've got to have a reasonable rotation of your municipal wells allowing some to recharge while you're using others. With that

## A.

### Standard of Review

A court may adopt and incorporate a proposed stipulation into a decree. *Colo. River Water Conservation Dist. v. Bar Forty Seven Co.*, 195 Colo. 478, 481, 579 P.2d 636, 638 (1978). Courts interpret a stipulated decree as they would a contract. *City of Golden v. Simpson*, 83 P.3d 87, 93 (Colo. 2004); *United States v. N. Colo. Water Conservancy Dist.*, 608 F.2d 422, 430 (10th Cir. 1979).

Our review of the lower court's contract interpretation is de novo. *City of Golden v. Simpson*, 83 P.3d at 94. Our primary goal is to implement the intent of the parties as expressed in the agreed-upon language contained in the decree; to ascertain this intent we turn first to the plain and generally accepted meaning of the words as this is the best way to ensure consistency and stability in the enforcement of water decrees. *Id.* at 93.

Extrinsic evidence is admissible to prove intent when there is an ambiguity in the terms of the agreement; merely because the parties have different opinions regarding the interpretation of the agreement does not itself create an ambiguity. *USI Props. E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997).

When interpreting a contract, we may consider the facts and circumstances attending its execution, so as to learn the intentions of the parties and carry out their intent. *Lane v. Urgitus*, 145 P.3d 672, 679 (Colo. 2006); *e.g., Bd. of County Comm'rs v. Crystal Creek Homeowners' Ass'n*, 14 P.3d 325, 340–41 (Colo.2000).

## B.

### The Language, Setting, Intent, and Meaning of This Provision

The stipulated provision we examine in this case is part of a 1999 decree that found

philosophy and goal, my answer is yes, Cherokee has utilized these wells to the full practical ability."

diligence for Cherokee's ten Sweetwater conditional rights. While continuing these conditional water rights in full force and effect, the diligence decree also contains provisions limiting the use of the Sweetwater Wells and Wells No. 1–8.

First, Cherokee's ten conditional Sweetwater rights are limited to diversion of 6,258 acre feet per year. Second, under the provision at issue in this case, the rights for Wells No. 1–8 are limited to supplying "in-basin beneficial uses that discharge any unconsumed water back into the Upper Black Squirrel Designated Basin" and for "emergency and backup purposes." The terms "emergency" and "backup" are not further defined, but "shall include the inability to get sufficient supply from the Cherokee owned Sweetwater wells."

Examining the plain language of the provision, it is clear that the primary purpose of the provision is to restrict the use of Wells No. 1–8 to supplying only those portions of the Cherokee district that are within the Designated Basin, so that unused water will be recharged into the aquifer. The words "emergency" and "backup" operate as exceptions to the provision's predominant export ban.

When we look to the common understanding of these words, we find that "emergency" means (1) "an unforeseen combination of circumstances or the resulting state that calls for immediate action"; or (2) "an urgent need for assistance or relief." [4] *Merriam–Webster* 407 (11th ed.2004). "Backup" means "one that serves as a substitute or support." *Id.* at 91.

Within the context of the 1999 diligence decree, the terms "emergency" and "backup" in this provision plainly imply a short-term situation during which water from Wells No. 1–8 can be exported to replace or substitute for disruption of Cherokee's primary source of supply to its service areas outside of the Designated Basin. In the water service context, such situations include emergency outages, malfunctions, or planned—for maintenance events that prevent delivery of water from the ordinarily-operating source of water supply.

Cherokee argues that the phrase "emergency and backup ... shall include the inability to get sufficient supply from the Cherokee owned Sweetwater wells" means that it can convert Wells No. 1–8 into a primary source of supply outside of the Designated Basin if the Sweetwater Wells turn out in the future not to be capable of providing enough water for that purpose.

However, the actual language of the agreement does not state this. A possible plain reading of this provision consistent with the short-term nature of an "emergency" and "backup" situation is that the Sweetwater Wells are specifically identified for the purpose of ensuring that Wells No. 1–8 can be utilized to substitute for Sweetwater Wells diversion and/or delivery infrastructure that needs to be repaired or replaced in order to resume water service from them, i.e., an "inability to get sufficient supply from the Cherokee owned Sweetwater wells" because of an outage of service.

Confronted with possible alternative constructions of the agreement, the water court concluded that an ambiguity existed and received extrinsic testimonial and documentary evidence at a two-day trial.

As a consequence, the water judge then found that: (1) all the parties intended that Wells No. 1–8 would be utilized primarily for supplying Cherokee in-basin beneficial uses that discharge any unconsumed water back into the Designated Basin; (2) at the time the parties entered into the stipulation, Cherokee's commitment to provide water to homes and businesses within its boundaries outside of the Designated Basin totaled no more than 2,683 acre feet annually; (3) at the time the parties entered the stipulation Cherokee anticipated that the Sweetwater Wells would produce 6,000 acre feet of water per year; (4) after the stipulation, Cherokee undertook a series of commitments to supply

---

4. The water court observed that an emergency describes something that is "[a] sudden unexpected happening, an unforeseen occurrence or condition. It is an unforeseen combination of circumstances that call[s] for immediate action without time for full deliberation." *Black's Law Dictionary* 522–23 (6th ed.1998).

water to new developments within its boundaries outside of the Designated Basin; (5) Cherokee's current commitments to supply water outside the Basin are as much as 4,944.02 acre feet per year; (6) the Sweetwater Wells are capable of producing 3,407 acre feet annually; (7) Cherokee has the opportunity to access 10,000 acre feet of water from other sources if it cannot rely on Wells No. 1–8, but the use of those wells is cheaper; and (8) Cherokee is contemplating further development in its service area. These findings are supported by evidence in the record.

■ Examining the language of the stipulated decree provision in light of the extrinsic evidence, the water court concluded that Wells No. 1–8 may be used to supply water outside of the Designated Basin only for emergency and backup purposes when its Sweetwater Wells are unable to produce a sufficient supply of water to meet the commitments that existed at the time the parties entered into this stipulation. We agree.

Any scenario that would place Wells No. 1–8 into permanent operation as a primary supply for service areas outside of the Designated Basin would undermine the principal anti-export language and purpose of the stipulated decree provision, which dedicates those wells for use only within the Designated Basin, except for short-term emergency and backup situations. Cherokee's version of the agreement would deprive the Management District of the benefit of the bargain by reversing the intended operation of the provision: anti-export would be the short-term feature of the provision and permanent export the long-term feature as Cherokee water demand grows outside of the Designated Basin.

Cherokee's desired construction of the provision contravenes the parties' intent. Because it wanted a stipulated resolution to its diligence application, Cherokee was willing to assume the obligation of providing a primary water supply for uses outside of the Designated Basin from other sources, while dedicating Wells No. 1–8 to in-basin use only, except for short-term emergency or backup circumstances. At the time of the diligence decree's issuance, in 1999, the primary out-of-basin area Cherokee served was Cimarron Hills, requiring 2,683 acre feet of water annually. The water court found that the Sweetwater Wells Cherokee has developed to date can provide up to 3,407 acre feet annually, although Cherokee argues that 2,400 acre feet is a more realistic figure.

Other provisions of the diligence decree support the water court's construction of the parties' agreement. Not only does the stipulated decree allow Cherokee to divert 6,258 acre feet of diversion per year from the Sweetwater Wells for export out of the Designated Basin, it also allows Cherokee to divert for export a total of 10,000 acre feet of water from the southern part of the Designated Basin, should it obtain additional rights from this portion of the Designated Basin to supplement its currently owned Sweetwater rights. The parties reached agreement on these provisions in tandem with their joint agreement that Wells No. 1–8, which are located in the severely-stressed northern part of the Designated Basin, should be dedicated with limited exceptions to Cherokee's in-basin use only, so that return flows would recharge the aquifer.

The Management District was the principal party in interest to the anti-export feature of the 1999 stipulation applicable to Wells No. 1–8.[5] In December 1998, Cherokee advanced its proposal to "capture the 4,000 to 6,000 [acre feet] of water that is flowing out of the lower portion of the Basin" and, in exchange, it would "reduce the pumping on its wells 1–8 and would use them for emergency and backup." In accepting this core proposal, the Management District agreed to cease pursuing other restrictions it would like to have had in the diligence decree.

In regard to the reasons for the stipulated provision, the President of the Management

5. The Management District's rules contain a provision prohibiting exports unless permission is obtained by the district's board upon a showing that such use will not materially affect any vested rights to the use of designated groundwater within the basin. Upper Black Squirrel Creek Ground Water Management District Rules and Regulations and Statement of Policy, As Amended through June 1, 2004, 7, http://water.state.co.us/cgwc/rules-regs/UBSCRules.pdf.

District Board, Dean Goss, testified before the Water Court regarding its anti-export purpose as follows:

MR. LIPUMA [counsel for the Management District]:

Q. Tell the Court about what disputes came up with regard to those [the Sweetwater] rights.

A. They didn't have, as far as we was concerned—the District has a rule that says there is not any more water to be taken out of the basin and they didn't as far as we was concerned have the right to take those wells out of the basin.

Q. When you say wells out of the basin, if I could paraphrase, are you saying the district, the Upper Black Squirrel Creek District was prepared to limit the export of water from those Sweetwater Wells outside of the basin?

MR. SCHROEDER [counsel for Cherokee]: Objection. Leading.

A. Yes.

THE COURT: It is a leading question and it's been answered.

MR. LIPUMA

Q. Now at some point, did you and other board members enter into negotiations with Cherokee to resolve all those disputes that existed in 1999?

A. Yes.

* * *

Q. Okay. Now could you just explain to the court in your own words what it was that you and the other board members of the Upper Black Squirrel were attempting to publish in terms of this settlement agreement?

A. Basically, we wanted to relieve the pressure from—on wells 1 through 8, the upper end of the basin, and let them pump the water from the other end of the basin to try to get some kind of recharge on the upper end for their 48 acres.

Q. When you say you were going to allow them to pump wells, is the deal that you were actually to export water out of the Sweetwater Wells?

A. That's the only reason why we allowed them to export the water if they didn't use wells 1 through 8.

In regard to the meaning of the emergency and backup provision and the total commitment of Cherokee out of the Designated Basin for which Wells No. 1 to 8 would be available for export, Mr. Goss testified as follows:

MR. LIPUMA

Q. All right. Let's go ahead then and talk about the key paragraph here, which is paragraph 4C. Will you explain for the Court how you understood that paragraph and how it was negotiated?

A. Well, I think the way that I understood it was such as if Sweetwater says that they had a water main break or a well go down, that would be when they could use wells 1 through 8.

And we also told them while they were doing the construction of Sweetwater putting their water mains, it would be a period of about a year or so that they could use wells 1 through 8. And we sure didn't—we really didn't think it would be very long because well no. 13 was 1300 gallons a minute at that time. Their commitment was only 2400 in Cimarron Hills. And the way I understood it they only had a little bit of industrial left in Cimarron Hills to complete. So the total commitment was 2600 acre-feet of water well with that. That one we—we thought one more well and they should be done and basically that can take care of their own commitments. And wells 1 through 8 could be backed off immediately.

Q. And specifically, with respect to your understanding that their commitments were 2600 acre-feet, what was that based on?

A. Stu [Loosely, Manager of Cherokee] and Pete Susemihl [attorney for Cherokee] at the meeting told us that Cimarron Hills—Cimarron Hills was about 2400 acre-feet and they still had a little bit of industrial part to finish and that would be approximately 200 and that was 2600 acre-feet total that would be taken out of the basin.

* * *

Q. Okay. With respect to the sentence at the end of paragraph 4C, that specifically

says, "Emergency and backup use shall include the inability to get sufficient supply from the Cherokee-owned Sweetwater Wells." What did you understand the terms "sufficient supply" to relate to?

A. That they couldn't supply Cimarron Hills with the Sweetwater Wells.

Q. When you say Cimarron Hills, are you talking about commitments that existed then?

A. Yeah, Cherokee District.

Q. What understanding did you have about commitments that may be undertaken in the future?

A. That they could use Sweetwater Wells—that they could take—all they could basically get out of their Sweetwater Wells out of the basin, but if they didn't have it, they couldn't use wells 1 through 8. That wasn't the agreement.

Q. Have Cherokee's commitments changed significantly since 1999?

A. I think they doubled.

While agreeing that the Management District's goal in the negotiations leading up to the parties' agreement was to prevent the export of water outside of the Designated Basin as much as possible, Mr. Susemihl in testifying for Cherokee stated the purpose of the stipulated provision was to allow Cherokee to use Wells No. 1–8 as a primary supply out of the Designated Basin, if Sweetwater supply were not sufficient to meet Cherokee commitments, whenever they might be made.

MR. LIPUMA

Q. There's no dispute that wells 1 through 8 would be used inside the basin, correct?

A. Correct.

Q. Correct. Now, that provision with regard to emergency and backup essentially has two components. First it says that wells 1 through 8 shall only be used for emergency and backup, and then it goes on to modify what emergency and backup means?

A. That's correct.

* * *

Q. Okay. It's certainly Cherokee's position that—that emergency and backup

may be used to the extent that Cherokee can't get sufficient supply relating to supply for all of Cherokee's commitments no matter when those commitments are made?

A. That's correct.

Q. Okay. And you testified a moment ago that the stipulation allows wells 1 through 8 to be used as a primary source of water supply. Do you remember saying that?

A. Yes.

Q. You didn't mean that, did you?

A. Yes, I did.

Q. But there's nothing in the stipulation that allows that water to be a primary source of supply?

A. I don't know how else to read it if we can't get sufficient supply from Sweetwater.

Q. Then the wells 1 to 8 can be used as secondary supply, correct?

A. No. They can be used like any other wells.

Hearing this and the other evidence it received at the evidentiary hearing, the water court resolved the factual issues regarding the stipulated decree provision's meaning in favor of the Management District's view of the parties' intent. In regard to operation of Wells No. 1–8, the court found that the parties were equally concerned about "exportation of water outside the Basin which would be totally lost to the Basin."

■ We defer to the court's findings of fact if they are supported by the record and review the court's legal conclusions de novo. *Vought v. Stucker Mesa Domestic Pipeline Co.*, 76 P.3d 906, 913 (Colo.2003). Had the parties intended to maintain Cherokee's ability to utilize Wells No. 1–8 as a primary supply outside of the Designated Basin in the event the Sweetwater Wells did not turn out to be capable of producing the 6,285 acre feet per year of primary water supply anticipated from them in the diligence decree, they could have said so. The circumstances surrounding the 1999 agreement demonstrate that the parties were addressing the then-current water demands of Cherokee. In doing so, they devised a way to allow short-term exports of water from Wells No. 1–8 to meet those commitments should the Sweetwater Wells experience a disruption in service.

As part of the agreement, Cherokee pledged that development of the Sweetwater Wells to their full extent and acquisition of water from other sources would supply Cherokee's future growth outside of the Designated Basin. Whereas, at the time of the 1999 stipulation Cimarron Hills was the primary area served outside of the Designated Basin, Cherokee has since added other areas of service. The addition of these other areas has caused Cherokee to advance the position that Wells No. 1–8 can be used for a primary supply of water outside of the Designated Basin.

■ The 1999 stipulation reflects no language or intent showing that the principal anti-export feature of the agreement relating to Wells No. 1–8 would become non-operational in the event of future Cherokee development. In reaching their 1999 agreement, Cherokee and the Management District overcame polar opposite positions. Cherokee argued that the Management District could place no export restrictions on any of its groundwater supply taken from the Designated Basin; the Management District contended that it had authority to do so. Regardless of who had the better of the argument, a party may stipulate away valuable rights provided it is not in violation of public policy. *USI Props. E.*, 938 P.2d at 173.

Accordingly, we conclude that the water court's construction of the contested stipulated decree provision correctly reflects the language of the agreement and the parties' intent.

### C.

### Cherokee's Promissory Estoppel Argument

■ Cherokee asserts that the State Engineer's office had agreed with its inter-

pretation of the stipulated decree provision; accordingly, the doctrine of promissory estoppel prevents that office from changing its position.

■ The elements of a promissory estoppel claim are (1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice. *Berg v. State Bd. of Agric.*, 919 P.2d 254, 259 (Colo.1996).

The water court did not find that Cherokee had met its burden of proving facts establishing its promissory estoppel claim. To the contrary, in consulting with El Paso County pursuant to the provisions of section 30–28–136(1)(h), C.R.S. (2006)(providing consultation requirements regarding water supply for proposed subdivision), the State Engineer's office since the year 2000, except in two possible instances, took the position that Wells No. 1–8 were not available for use outside of the Designated Basin except under short-term emergency or backup circumstances. It did this by means of tables attached to its consultation letters showing Wells No. 1–8 with a positive value only for water use inside the Designated Basin and a zero value for use outside of the Designated Basin. If the proposed subdivision was outside of the Designated Basin, the State Engineer's consultation opinion referred to other Cherokee water sources, including the Sweetwater Wells.[6]

Cherokee claims that, on one occasion, a State Engineer employee stated his agreement that Wells No. 1–8 could be used outside the Designated Basin as a primary wa-

---

6. Several tables included a note that states, "[t]he Northern Eight Municipal wells may be used outside the [Designated Basin] only if Cherokee's other sources are insufficient to meet the demand for water outside the [Designated Basin]." Cherokee takes this to be a promise from the State Engineer that it may use water from Wells No. 1–8 if the Sweetwater Wells do not yield as much water as they hoped. We disagree. This note is simply a repetition of the stipulation, intended to make sure that El Paso County is aware that Wells No. 1–8 produce water for Cherokee, but that water cannot be exported unless the emergency and backup provision applies. This is not a promise that water from Wells No. 1–8 can be exported as a primary source of supply if the Sweetwater Wells do not prove productive to the full extent projected in the diligence decree.

ter source if the anticipated yield of the Sweetwater Wells were not realized. But, another State Engineer's Office employee who heard this conversation testified that the other employee only indicated that he understood what Cherokee was saying, not that he agreed with it.

On another occasion, the State Engineer's Office mistakenly listed Wells No. 1–8 as available for use outside the Designated Basin, but corrected the mistake upon realizing the error.

■ We have previously held that the State Engineer's "administrative decisions do not determine the property rights of appropriators." *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 49, 58 (Colo.1999). This is the role of the court following notice and proceedings that allow all interested parties to participate and present evidence. The purpose of Colorado's adjudication system is to produce decrees that will be reliably enforced. When stipulated decrees are the product of agreement among a number of parties and all the parties are not in agreement as to its proper construction following issuance of a decree containing the provision, the appropriate procedures include the one Cherokee invoked in this case—a noticed court action seeking a ruling as to the proper construction of the provision.

■ Here, Cherokee apparently takes the position that the acquiescence of a State Engineer employee to its interpretation can bind not only that office but the Management District as well. However, the Management District has considerable statutory authority and responsibility within its boundaries for maintaining sustainable water levels within the Designated Basin. *See Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss,* 993 P.2d 1177 (Colo.2000).[7] When water is pumped from the basin at a greater rate than that of recharge, the water of the basin is "mined." If mining continues uncontrolled, a groundwater basin will eventually go dry. James N. Corbridge Jr. & Teresa

Rice, *Vranesh's Colorado Water Law* 180 (rev. ed.1999).

The Management District has consistently viewed Wells No. 1–8 as being unavailable under the stipulated decree provision for purposes of a primary water supply outside of the Designated Basin.

In contrast to a prolonged course of conduct establishing the parties' construction of the agreement prior to the time the dispute arose, such as in *Town of Estes Park v. Northern Colorado Water Conservancy District,* 677 P.2d 320, 327–28 (Colo.1984), there is no evidence in this case of a course of conduct by the parties demonstrating agreement with Cherokee's interpretation.

In sum, we conclude that no promise was made that would bind the parties to Cherokee's view of the 1999 stipulation and the record supports the water court's construction of the agreement, not Cherokee's.

### III.

Accordingly, we affirm the water court's judgment.

Justice COATS dissents.

Justice EID does not participate.

Justice COATS, dissenting.

I agree that the stipulated decree must be construed according to accepted principles of contract interpretation, but I disagree with the majority's understanding and application of those principles. Because of its predisposition to limit the exportation of water from the designated groundwater basin, I believe the majority fails to consider objectively the language of the stipulation or the extrinsic evidence of its development. While public policy considerations may have been appropriate justification for not accepting the stipulation of the parties in the first place, or even for nullifying it now, I do not believe they can justify interpreting it for the benefit of the management district and engineer.

---

7. When the Groundwater Commission designates a groundwater basin the water in that basin is subject to the modified doctrine of prior appropriation, which includes a use component and a conservation component. *Gallegos v. Colo. Ground Water Comm'n,* 147 P.3d 20, 27 (Colo. 2006); *Goss,* 993 P.2d at 1183.

On its face, the disputed provision permits the Cherokee Wells 1–8 to be pumped for in-basin beneficial uses *and equally* for emergency and backup purposes, to include the inability of Cherokee to get sufficient supply from its Sweetwater wells. Nevertheless, the majority finds it clear from the provision's plain language that its primary purpose is to restrict the use of wells 1–8 to supplying those portions of the district that are within the designated basin. With this bent of mind, the majority predictably finds that the word "backup" operates merely as an exception to a predominant anti-export ban and is limited to temporary or short-term situations; and furthermore, that the stipulation's provision for the contingency that Cherokee might be unable to get sufficient supply from its Sweetwater wells was intended by the parties only as a reference to the current, rather than projected, commitments of these wells. In my view, neither finding is supported by accepted principles of contract interpretation or the record.

While there is nothing in even the common understanding of the term "backup" to imply a short-term or temporary situation, I object to the majority's attempt to restrict the terms "emergency" and "backup" to their common meaning. In the stipulation itself the parties have provided their own understanding of these terms, which, as a matter of contract construction, they certainly may do. *See Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313–14 (Colo.1984) ("*In the absence of contrary manifestation of the intent in the contract itself,* contractual terms that have a generally prevailing meaning will be interpreted according to that meaning." (emphasis added)); *see, e.g., Mass. Mun. Wholesale Elec. Co. v. Town of Danvers*, 411 Mass. 39, 577 N.E.2d 283 (1991) (common meaning of "default" altered by parties to include nonpayment for any reason rather than merely for failure to perform a legal or contractual duty); *see generally* 9 Margaret N. Kniffin, *Corbin on Contracts* § 24.8 (rev. ed. 1998) ("Ordinary English words can be deprived of their ordinary meanings and supplied with others—even with meanings that are the exact opposite of their ordinary ones."). Nothing in the parties' specific provision for backup of the Sweetwater wells remotely suggests a limitation to short-term emergencies, like outages of service.

To the extent the stipulation of the parties remains ambiguous, however, it does so only with regard to assessing the ability of the Sweetwater wells to perform as anticipated. Generally, when ability to perform is made a condition of a contract, courts must give reasonable meaning to the word "ability," having reference to all the other calls upon the promisor's resources. *Id.* § 31.3 ("Promise to Perform When Able, or Out of Earnings"). A party's ability to perform clearly cannot be discretionary on its part, *see generally, Western Hills, Or., Ltd. v. Pfau*, 265 Or. 137, 508 P.2d 201, 203 (1973), but must involve considerations of good faith and reasonableness. *Cf. Colo. Woman's Coll. v. Bradford–Robinson Printing Co.*, 114 Colo. 237, 242, 157 P.2d 612, 614 (Colo.1945) (where no time of performance is specified, performance within a reasonable time is required).

In addition to limiting the backup function of Cherokee's wells 1–8 to short-term, emergency situations, the water court also interpreted the stipulation to permit the backup of Cherokee's Sweetwater wells only in meeting those commitments already existing at the time of the stipulation. Despite clear evidence that Cherokee anticipated its Sweetwater wells would produce enough for (and had conditional rights to) between two and three times their existing out-of-basin commitments, and that it was attempting through these negotiations to hedge against over-projection of their capacity, the water court concluded, virtually without explanation or support, that both parties were equally concerned about exportation of water from the basin. While the majority prefers to view this as a resolution of disputed fact in favor of the management district and engineer, nothing in the water court's order suggests that it recognized or intended to resolve any such conflict. Instead, both the majority and water court ignore Cherokee's clear interests and motivation, and simply presume that the management district and engineer would not have agreed to any such open-ended, out-of-basin use.

While I agree with the majority that the stipulated decree in this case was bargained for to avoid the costs and uncertainties of litigation, it is abundantly clear that the parties did not have, and could not possibly have had, the same interest in banning the exportation of water from the designated groundwater basin. The provision for backup usage outside the basin, which was expressly bargained for by Cherokee, contains none of the limitations found by the water court; and unlike the majority, I can discern no principle of contract construction that would impose on Cherokee, rather than the management district, a burden to define with greater specificity the terms of the stipulation. I believe any objective reading of the stipulation demonstrates that it is Cherokee, rather than the management district, which is being denied the benefit of its bargain.

I would therefore reverse the order of the water court and remand for reconsideration of the reasonableness of Cherokee's development of its Sweetwater well capacity.

I respectfully dissent.