Colorado Supreme Court Opinions || June 22, 2015


Colorado Supreme Court -- June 22, 2015
2015 CO 47. No. 13SA330. Concerning the Application for Water Rights for Cherokee Metropolitan District in El Paso County: Upper Black Squirrel Creek Ground Water Management District v. Cherokee Metropolitan District.



 
 The Supreme Court of the State of Colorado 
 2 East 14th Avenue â¢ Denver, Colorado 80203
 
 
 2015 CO 47
 
 
 Supreme Court Case No. 13SA330 
 Appeal from the District Court 
 El Paso County Court, Water Division 2, Case No. 98CW80
 Honorable Larry C. Schwartz, Water Judge
 
 
 Concerning the Application for Water Rights for Cherokee Metropolitan District in El Paso County, Colorado
 Opposer-Appellant/Cross-Appellee: 
 Upper Black Squirrel Creek Ground Water Management District,
 
 v.
 
 Applicant-Appellee: 
 Cherokee Metropolitan District,
 Intervenor-Appellee/Cross-Appellant: 
 Meridian Service Metropolitan District,
 and Appellees Pursuant to C.A.R. 1(e):
 
 Steven J. Witte, Division Engineer, Water Division 2, and
 Dick Wolfe, State Engineer.
 
 
 Judgment Affirmed 
 en banc
 
 June 22, 2015
 
 
 Attorneys for Opposer-Appellant/Cross-Appellee: 
 Trout, Raley, MontaÃ±o, Witwer & Freeman, P.C.
 Lisa M. Thompson
 Peggy E. MontaÃ±o
 Douglas M. Sinor
 April H. Killcreas
 
 Denver, Colorado


 
 Attorneys for Applicant-Appellee:
 Peter C. Johnson
 
 Denver, Colorado
 
 Hoffman, Parker, Wilson & Carberry, P.C.
 Jefferson H. Parker
 Ryan S. Malarky
 
 Denver, Colorado
 
 Singularity Legal, PLLC
 Gregory R. Picheâ
 
 Denver, Colorado
 
 Jackson Kelly PLLC
 Heather E. Joyce
 
 Denver, Colorado
 
 Attorneys for Intervenor-Appellee/Cross-Appellant: 
 W.B. Schroeder Law Office, LLC
 Wayne B. Schroeder
 
 Boulder, Colorado


 JUSTICE COATS delivered the Opinion of the Court.

 
 JUSTICE HOBBS concurs in part and dissents in part, and CHIEF JUSTICE RICE joins in the concurrence in part and dissent in part. JUSTICE BOATRIGHT does not participate.Â 


 
 Â¶1Â Â Â Â Â Â  Upper Black Squirrel appealed from an order of the water court interpreting an earlier stipulated decree, to which it and Cherokee Metropolitan were parties, concerning the latterâs rights to ground water in the Upper Black Squirrel Basin and, particularly, its right to export water for use outside the basin. Upper Black Squirrel sought a declaration that a provision of the stipulation, which required Cherokee to deliver wastewater returns back into the basin for recharge of the aquifer, barred Cherokee and Meridian, another metropolitan district with which Cherokee had entered into an intergovernmental agreement, from claiming credit for these wastewater returns as replacement water, for purposes of acquiring the right to additional pumping from Cherokeeâs wells in the basin. The water court ruled instead that nothing in the stipulation, and particularly not its use of the word ârecharge,â implied abandonment or forfeiture of any right Cherokee might otherwise have to claim future credits with the Ground Water Commission.
 
 Â¶2Â Â Â Â Â Â  Although the water court found that Meridian, as a nonparty, was not bound by the stipulation in any event, it assessed costs and attorney fees against Meridian for pursuing frivolous defenses. Meridian cross-appealed the water courtâs order imposing costs and attorney fees.
 
 Â¶3Â Â Â Â Â Â  Because the water court properly interpreted the stipulation, and because it did not abuse its discretion in ordering costs and fees, its orders as to which error has been assigned on appeal and cross-appeal respectively are affirmed.
 
 I.


 
 Â¶4Â Â Â Â Â Â  In 2009, Upper Black Squirrel Creek Ground Water Management District (âUBSâ), a governmental body statutorily charged with managing ground water in the Upper Black Squirrel Creek Ground Water Basin, filed a pleading with the water court styled âMotion for Declaratory Judgment Regarding Previous Stipulation of the Parties Entered in this Case No. 98CW80.â Case No. 98CW80 began with the filing of an âApplication for Sextennial Finding of Reasonable Diligenceâ by Cherokee Metropolitan District, a statutorily formed and operated special district, with regard to certain of its conditional water rights known as âthe Sweetwater wells.â A number of disputes concerning Cherokeeâs ground water rights in the Upper Black Squirrel Creek Basin were resolved by a 1999 stipulation, entered into by Cherokee, UBS, the State and Division Engineers, and the Colorado Ground Water Commission. See Cherokee Metro. Dist. v. Meridian Serv. Metro. Dist. (Cherokee III), 266 P.3d 401, 403â04 (Colo. 2011) (recapping tortured history of the proceedings up to that point); see also Cherokee Metro. Dist. v. Upper Black Squirrel Designated Ground Water Mgmt. Dist. (Cherokee II), 247 P.3d 567 (Colo. 2011); Cherokee Metro. Dist. v. Simpson (Cherokee I), 148 P.3d 142 (Colo. 2006).
 
 Â¶5Â Â Â Â Â Â  More particularly, the 2009 motion by UBS referenced an application for replacement plan filed with the Colorado Ground Water Commission by Cherokee and Meridian Service Metropolitan District, another statutory district with which Cherokee had entered into an intergovernmental agreement concerning a new wastewater treatment plant to process wastewater from both service areas. UBS opposed thisÂ application before the Commission; moved for a declaration by the water court to the effect that the terms of the 1999 stipulation prohibited Cherokee and Meridian from claiming credit for the wastewater returns Cherokee was obligated to deliver back into the basin; and sought to enjoin Cherokee from asserting such a claim in an application for replacement plan before the Commission. The water court granted a preliminary injunction as requested; denied Meridianâs motion to intervene; and declared that the stipulation prohibited Cherokee or any other persons from claiming a credit in Cherokeeâs replacement plan application for the wastewater returns it delivered back into the basin.


 
 Â¶6Â Â Â Â Â Â  Cherokee appealed the declaration to this court, and after determining that the water court erred in denying Meridianâs motion to intervene, we vacated the water courtâs declaration and ordered it to permit Meridian to participate in any further proceedings. See Cherokee III, 266 P.3d at 408. Upon remand, UBS filed an amended motion for declaratory judgment, and the parties and intervenor were permitted to rebrief the issue. Following the retirement of the water judge who made the initial rulings, a different water judge ruled on the basis of the new briefs, disagreeing in significant part with the earlier ruling by concluding that the 1999 stipulation does not preclude Cherokee from making a claim for return flow credits as part of its replacement plan pending before the Ground Water Commission.
 
 Â¶7Â Â Â Â Â Â  More particularly, the water court emphasized the narrowness and formality of its ruling. In its written order on remand, it made clear that the only question before itÂ involved the interpretation of paragraph 5 of the stipulation, which was entitled, âRECHARGE,â and consisted of two sentences:


 
 Cherokee will use its best efforts to deliver wastewater returns from Sunset, Paintbrush, and Woodman Hills subdivision, Falcon Air Force Base and any other subdivisions it services back into the Upper Black Squirrel Creek Designated Basin for recharge of the aquifer. Cherokee shall recharge any wastewater returns from the Sunset Plant in the aquifer.
 
 While the water court agreed that paragraph 5 clearly requires the return by Cherokee of certain recycled wastewater to the basin, rather than putting it to successive uses or permitting its return to the stream in the receiving basin, it found nothing in the language of the stipulation precluding Cherokee from making a claim for return flow credits with the Commission. By the same token, however, it specified that its order implied nothing about the merits of the application of Cherokee/Meridian, and that the Ground Water Commission remained completely free to determine whether the proposed replacement plan would meet the burden imposed on applicants to replace the amount of designated ground water withdrawn.
 
 Â¶8Â Â Â Â Â  In addition, the court concluded that Meridian was not a party to the 1999 stipulation, and accordingly, it could not, in any event, preclude Meridian from claiming replacement credit. In a subsequent order, however, the water court did grant attorney fees and costs to UBS in the amount of $7,600, as the result of what it found to be substantially frivolous and groundless arguments advanced by Meridian concerning the jurisdiction of the court.


 
 Â¶9Â Â Â Â Â Â  UBS appealed from the water courtâs order denying its motion for declaratory judgment, and Meridian cross-appealed concerning the courtâs award of costs and fees.
 
 II.
 
 Â¶10Â Â Â Â Â Â  Although the question before us is ostensibly, as it was in the water court, one of interpreting the 1999 stipulation, there is surprising agreement among the parties about not only the applicable principles of interpretation but even the meaning of the relevant terms and provisions of the stipulation. Rather, the dispute among the parties in this court centers largely around the precise meaning and extent of the water courtâs order, its effect on proceedings before the Ground Water Commission, and the law governing both the appropriation of ground water and allowable usage of foreign water.
 
 Â¶11Â Â Â Â Â Â  There is no dispute that the 1999 stipulation should be interpreted according to the principles governing the interpretation of contracts or that the stipulation must be given meaning according to the intent of the parties as expressed in the instrument. See USI Prop. E., Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997). Similarly, unless the terms used in the stipulation have been given specific meaning, as terms of art, they are to be interpreted according to their common understanding, in context and according to their relative placement and function, as dictated by accepted rules of grammar and syntax. See generally 2 E. Allan Farnsworth, Farnsworth on Contracts Â§ 7.11 (3d ed. 2004). The parties appear to agree that, in context, the term ârechargeâ refers to replenishment of the aquifer. See Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss, 993 P.2d 1177, 1183 (Colo. 2011). They disagree only about the effect of the requirement for Cherokee to deliver wastewater returns back into the basin for recharge, or replenishment, of theÂ aquifer on Cherokeeâs position with regard to its application for new and additional appropriative rights in the basin.


 
 Â¶12Unlike the âwaters of any natural stream,â Colo. Const. art XVI, Â§ 6, the management of designated ground water is governed by the Colorado Ground Water Management Act. Â§Â§ 37-90-101 to -141, C.R.S. (2014). The allocation of rights to the use of ground water, which has been characterized as a modified prior appropriation regime, Â§ 37-90-102(1); Goss, 993 P.2d at 1183, is determined by application to the Ground Water Commission, which is charged with, among other things, ensuring that designated ground water aquifers are not unreasonably depleted. Â§ 37-90-111(1)(b); Goss, 993 P.2d at 1184. Withdrawals of designated ground water can be made under this system through the issuance of well permits pursuant to regulations of the Commission and the local ground water district for the maintenance of reasonable ground water pumping levels. See Colo. Ground Water Commân v. Dreiling, 606 P.2d 836, 839 (Colo. 1979); Gregory J. Hobbs Jr., Coloradoâs 1969 Adjudication and Administration Act: Settling in, 3 U. Denv. Water L. Rev. 1, 12 (1999).
 
 Â¶13Â Â Â Â Â Â Â  In addition, it is significant for the context of the stipulationâs recharge requirement that this requirement is expressly directed to water lawfully exported from the designated ground water basin. Unlike water native to a public stream, as to which appropriators have no automatic right to recapture and reuse, and which, after an initial application to beneficial use, must therefore be permitted to return to the stream for the benefit of junior appropriators, the reuse of foreign waterâwater lawfully exported from another basin, including nontributary ground water, see Â§ 37-82-106, C.R.S.Â (2014)âis governed by different return flow considerations altogether. See City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 66 (Colo. 1996). Until foreign water is released from the âdominionâ of the exporter, it is distinguishable from water to which the junior appropriators of the receiving basin are entitled; and an appropriator who has lawfully introduced foreign water into a stream system from an unconnected stream system may make a succession of uses of that water. Â§ 37-82-106.


 
 Â¶14Â Â Â Â Â Â  Against this backdrop, UBS characterizes the water courtâs order throughout as interpreting the stipulation to permit, or implicitly grant a right to, the recapture and reuse of the exported water described in paragraph 5. UBS accuses the water court of reasoning that the stipulationâs failure to expressly restrict Cherokee from using its return flows for replacement purposes amounts to an affirmative authorization for it to do precisely that and, therefore, to claim this wastewater as replacement credit. We reject this understanding of the lower courtâs ruling for at least two important reasons.
 
 Â¶15Â Â Â Â Â Â  First, it fails to appreciate the expressly limited nature of the ruling, which on its face emphasizes the distinction between the question whether a right has been stipulated away and the question whether such a right ever existed in the first place. The water courtâs ruling is expressly and appropriately limited to a determination that the stipulation is silent with regard to, and therefore fails to evidence, any agreement to relinquish benefits Cherokee might seek to claim in applying to the Commission for a new appropriation. It implies absolutely nothing about the merits of such a claim and expressly finds those merits to be entirely a matter for the Ground Water Commission, according to the rules and regulations by which it fulfills its statutory mission.Â 


 
 Â¶16Â Â Â Â Â Â  Second, UBS attributes to the term âreuseâ a meaning that is not only unsupported by the authorities upon which it relies, but is in fact one that stands customary usage on its head. The reuse of water consistently refers, in the case law of this jurisdiction, to putting that water to some additional beneficial use after its having already been put to the beneficial use for which it was decreed, see, e.g., City & Cnty. of Denver v. Fulton Irrigating Ditch Co., 506 P.2d 144, 147 (Colo. 1972) (holding that Denver had the right to reuse sewage effluent because Denver had authority pursuant to statute and prior case law to âre-use, successive use and disposition of foreign waterâ), as distinguished from allowing the unused portion of the decreed diversion to return to the stream for the benefit of junior appropriators, see Bijou Irrigation Co., 926 P.2d at 66. By contrast, in its criticism of the water courtâs order, UBS employs the term in reference to receiving credit for making the water available for further appropriation by returning it to the stream or, in this case, the aquifer. Returning unused water to the aquifer is the very opposite of âreusingâ it. In no meaningful sense can receiving credit for relinquishing dominion over return flows by delivering them back to the basin for recharge of the aquifer, in lieu of making successive uses of them, be characterized as reuse.
 
 Â¶17Â Â Â Â Â Â  The water courtâs order makes clear, and we agree, that the stipulation bars Cherokee from reusing the exported water, regardless of any right to reuse foreign water that it might otherwise have had and, instead, requires Cherokee to make its best efforts to recapture the specified wastewater returns and upon recapture to deliver them back into the Upper Black Squirrel Creek Basin for recharge of the aquifer. Whether or not Cherokee may yet derive some benefit from stipulating away its right to reuse the foreign water it has developed and agreeing instead to pump the unused portion of that water back into the basin, is a matter that is simply beyond the scope of the stipulation. Recharging, or replenishing, an aquifer clearly serves to prevent or at least mitigate its being mined; but the determination whether the resultant state of the aquifer is such that water is available for further appropriation, and if so, who should be granted such an appropriation, and on what terms, are all questions governed by a different authority, according to rules and regulations promulgated for that purpose.


 
 Â¶18Â Â Â Â Â Â  UBS offers extrinsic evidence to demonstrate that the recharge provision of paragraph 5 was integral to its agreement to the export of any of the Sweetwater rights whatsoever. While this is undoubtedly the case, that fact alone offers little assistance in resolving the question before the court. The stipulation clearly mandates that Cherokee forego its right to reuse the exported water or even to permit the wastewater to return to the natural streams of the basin of service. Instead the stipulation mandates that Cherokee use its best efforts to recapture the return flows and pump them back into the Upper Black Squirrel Creek Basin. Whether any more than this was intended by UBS is not evidenced by the correspondence to which it refers, and that correspondence most certainly does not suggest any reason to believe Cherokee should have known, much less agreed to, any such further limitation.
 
 Â¶19Â Â Â Â Â Â  UBS also asserts that it would have no reason to agree to a provision that did not foreclose Cherokeeâs right to assert a benefit for returning the specified water to the basin. Without such further limitation, it asserts, the provision could have no benefitÂ for the basin. But this is clearly not the case. Without the redelivery and recharge provision of paragraph 5, the return flows of the exported water would return to the natural stream of the service area and, whether first reused by Cherokee or used by some junior appropriator in that basin, would be entirely lost to the Upper Black Squirrel Creek Basin. The export and recharge provisions of the stipulation provide costs and benefits for both UBS and Cherokee. Nothing in either the terms of the stipulation itself or any extrinsic evidence of purpose evidences the extent to which UBS, much less Cherokee, was willing to compromise to gain some of what it considered beneficial.


 
 Â¶20Â Â Â Â Â Â  Depending upon the specific context or designated purposes for which the recharge of an aquifer were required, the term ârechargeâ could have additional implications, but standing alone it simply refers to the physical act of replenishing the aquifer. As the state engineer later put it in advising UBS concerning the need to clarify its rules, ââRechargeâ could mean the physical act of recharging water into an aquifer with loss of dominion and control, or the physical act of recharge in a recharge/storage/recovery plan approved by the Commission under Designated Basin Rule 5.8, or the physical act of recharging replacement water under a replacement plan.â[1] (Emphasis added). We agree with the water court that nothing in paragraph 5âs requirement for Cherokee to deliver wastewater back into the basin for recharge of theÂ aquifer implies that it either must or must not be entitled to credit in a subsequent application to the Ground Water Commission for further appropriation.


 
 III.
 
 Â¶21Â Â Â Â Â Â  On cross-appeal Meridian assigns error to the water courtâs award of costs and attorney fees for its repeated challenges to the courtâs jurisdiction to either interpret the 1999 stipulation or grant UBSâs motion for preliminary injunction.
 
 Â¶22Â Â Â Â Â Â  A party in proceedings before the water court may move for the award of attorney fees pursuant to section 13-17-102, C.R.S. (2014). Cherokee II, 247 P.3d at 175. The statute obligates a court to award attorney fees against an attorney or party it determines has asserted a claim or defense that lacks âsubstantial justification.â Â§ 13-17Â­102(2), (4); In re Marriage of Aldrich, 945 P.2d 1370, 1378 (Colo. 1997). By statute, âlacks substantial justificationâ means âsubstantially frivolous, substantially groundless, or substantially vexatious.â Â§ 13-17-102(4). In the past, we have indicated that a defense is substantially frivolous if the proponent can present no rational argument based on the evidence or law in support of that defense. See Application of Talco, Ltd., 769 P.2d 468, 476 (Colo. 1989). Similarly, a defense is substantially groundless if it is not supported by any credible evidence. Id. We have further observed that the rationale for awarding fees is strengthened if an action was defended in a manner that was stubbornly litigious. Id.
 
 Â¶23Â Â Â Â Â Â  The water court found that Meridianâs motions were without foundation, were substantially groundless, and were substantially frivolous in light of the clear history of the litigation. As the water court noted, not only had it previously ruled, on a numberÂ of occasions, that it had the jurisdiction to interpret the 1999 stipulation, but the El Paso County District Court had similarly done so, and this court had expressly done so as well. See, e.g., Cherokee II, 247 P.3d at 570 (âAlthough these are groundwater rights in a designated groundwater basin, the water court has continuing jurisdiction pursuant to our decision in Sweetwater Development Corp. v. Schubert Ranches, Inc., 535 P.2d 215, 218â19 (Colo. 1975).â); accord Cherokee I, 148 P.3d at 144. The water court further found not only that Meridian inexplicably exhorted it to overturn the rulings of this court, but also distorted the water courtâs own rulings by characterizing them as enjoining the Ground Water Commission and as adjudicating the replacement plan pending before that commission, both of which those rulings declined to do. Finally, the water court noted that Meridian itself was not even the subject of the courtâs preliminary injunction, which enjoined only Cherokee.


 
 Â¶24Â Â Â Â Â Â  While the water court may have inferred too much from this courtâs discretionary decision not to entertain Meridianâs petition for a writ of prohibition, which raised substantially identical challenges, that inference was clearly incidental to the abundance of evidence in the record to support its determination that Meridian stubbornly advanced defenses that lacked substantial justification. Meridian repeatedly made the same jurisdictional argument to the water court and continued to make that argument, without offering any rational distinction or change in the law, long after it had been ruled on by both the water court and this court.
 
 Â¶25Â Â Â Â Â Â  The water courtâs order of costs and attorney fees did not lack evidentiary support in the record.


 
 IV.
 
 Â¶26Â Â Â Â Â Â  Because the water court properly interpreted the stipulation, and because it did not abuse its discretion in ordering costs and fees, its orders as to which error has been assigned on both appeal and cross-appeal are affirmed.
 
 JUSTICE HOBBS concurs in part and dissents in part, and CHIEF JUSTICE RICE joins in the concurrence in part and dissent in part. JUSTICE BOATRIGHT does not participate.



 Â [1] Letter from Dick Wolfe, Ground Water Commission engineer, to Lisa Thompson, Black Squirrelâs counsel, dated Oct. 14, 2010 and attached by Cherokee as an exhibit to its brief in opposition of Black Squirrelâs motion for declaratory judgment in Case No. 98CW80.

 Â 

 
 JUSTICE HOBBS, concurring in part and dissenting in part.
 
 I.
 
 Â¶27Â Â Â Â Â Â  The majority holds that the 1999 Stipulation between Cherokee Metropolitan District (âCherokeeâ) and the Upper Black Squirrel Creek Ground Water Management District (âUBSâ) prevents Cherokee from claiming reuse or successive use rights to wastewater Cherokee returns to the Upper Black Squirrel Creek Designated Ground Water Basin (âUBS Basinâ) from subdivisions it serves within the purview of paragraph 5 of the Stipulation, which provides:
 
 RECHARGE: Cherokee will use itâs [sic] best efforts to deliver wastewater returns from Sunset, Paintbrush, and Woodman Hills subdivisions, Falcon Air Force Base and any other subdivisions it services back into the Upper Black Squirrel Creek Designated Basin for recharge of the aquifer. Cherokee shall recharge any wastewater returns from the Sunset Plant into the aquifer.
 
 Â¶28Â Â Â Â Â Â  Like the water court, the majority holds that the stipulation at issue in this case âbars Cherokee from reusing the exported water, regardless of any right to reuse foreign water that it might otherwise have had.â Maj. op. Â¶ 17. This includes Cherokeeâs agreement to surrender whatever reuse and successive use rights that Cherokee might otherwise assert in connection with such wastewater. In this regard, the majority recites with approval the water courtâs ruling that âparagraph 5 clearly requires the return by Cherokee of certain recycled wastewater to the basin, rather than putting it to successive uses or permitting its return to the stream in the receiving basin.â Id. at Â¶ 7. The majority holds that the stipulation ârequires Cherokee to make its best efforts to recapture the specified wastewater returns and upon recapture to deliver them back into the Upper Black Squirrel Creek Basin for recharge of the aquifer.â Id. at Â¶ 17. As the majority states, â[t]he stipulation clearly mandates that Cherokee forego its right to reuse the exported water or even to permit the wastewater to return to the natural streams of the basin of service.â Id. at Â¶ 18.


 
 Â¶29Â Â Â Â Â Â  Thus, the majority construes Cherokeeâs recharge/replenishment obligation as ârelinquishing dominion over return flows by delivering them back to the basin for recharge of the aquifer, in lieu of making successive uses of them.â Id. at Â¶ 16. In so ruling, the majority refers to Cherokee and Meridianâs intent to make a ânew appropriationâ and a âfurther appropriationâ of UBS Basin water. Id. at Â¶Â¶ 15, 17, 20.
 
 Â¶30Â Â Â Â Â Â  The majority recognizes the jurisdiction of the Ground Water Commission to determine, under the terms of the Ground Water Management Act and the rules of the Commission, whether to grant or deny Cherokee and Meridianâs application for ânew and additional appropriative rightsâ in the UBS Basin. Id. at Â¶ 11. The majority opinion preserves this essential Commission role and responsibility to protect other designated ground water use rights against material injury in regard to additional appropriations of UBS Basin water such as Cherokee and Meridian propose to make. The water court ruled, and the majority agrees, that
 
 âan applicant (for replacement plan approval) is required to replace the amount of designated ground water withdrawn with other water in such a way that no material injury occurs to other water rights.â It may be that the Ground Water Commission will yet determine that the Cherokee/Meridian replacement plan would not meet that burden.Â 


 
 Order Re: Upper Black Squirrel Ground Water Management Districtâs AmendedÂ  Motion for Declaratory Relief(Water Division 5, State of Colorado, June 17, 2013) (quoting Cherokee III, 266 P.3d 401, 403 n.1 (Colo. 2011)).
 
 Â¶31Â Â Â Â Â Â  I agree with the majority in each of these holdings and rulings. However, I disagree with the majorityâs statement that ânothing in paragraph 5âs requirement for Cherokee to deliver wastewater back into the basin for recharge of the aquifer implies that it either must or must not be entitled to credit in a subsequent application to the Ground Water Commission for further appropriation.â Maj. op. Â¶ 20.
 
 II.
 
 Â¶32Â Â Â Â Â Â  Cherokeeâs proposed replacement plan provides that for every acre foot of wastewater returned to the UBS Basin from Cherokeeâs new wastewater treatment plant, Cherokee will claim an equivalent volume of fully consumable replacement credit to offset new appropriations. Specifically, the replacement plan seeks to appropriate up to 3,036 acre feet per year of new diversions from the UBS aquifer through a combination of existing wells and six new proposed alluvial wells. By seeking replacement credit for the water it is already obligated to return to the UBS Basin, in order to then pump an equivalent amount out, Cherokee would be depriving UBS of its bargained-for recharge benefit negotiated in the 1999 Stipulation.
 
 Â¶33Â Â Â Â Â Â  Undoubtedly, in reviewing Cherokee and Meridianâs application, the Ground Water Commission will adhere to the courtâs construction of the Stipulation barring Cherokee from reusing or making a successive use of wastewater it has an obligation to recharge to the UBS Basin, regardless of any right of reuse or successive use it mightÂ otherwise have had. Nevertheless, I disagree with the majorityâs conclusion that â[w]hether or not Cherokee may yet derive some benefit from stipulating away [this] right . . . is simply beyond the scope of the stipulation.â See id. at Â¶ 17. The jurisdiction to interpret the 1999 Stipulation is squarely before us. See Cherokee I, 148 P.3d 142, 144 (Colo. 2006) (explaining that, although the water involved is designated ground water, the water judge retains jurisdiction over this case pursuant to our decision in Sweetwater Development Corp. v. Schubert Ranches, Inc., 535 P.2d 215, 218â19 (Colo. 1975)); Cherokee II, 247 P.3d 567, 570 (Colo. 2011) (same).


 
 Â¶34Â Â Â Â Â Â  Under the 1999 Stipulation, Cherokee derived an important benefit from contracting away any right of reuse or successive use it might otherwise have had. The agreement allowed Cherokee to export UBS water out of that designated basin for a first and only use, subject to returning the treated wastewater to the basin, instead of being barred from exporting any designated ground water. UBSâs Rules and Regulations contain a provision prohibiting exports unless permission is obtained from the districtâs board upon a showing that such use will not materially affect any vested rights to the use of designated ground water within the basin. Cherokee I, 148 P.3d at 148 n.5; Upper Black Squirrel Creek Ground Water Management District Rules and Regulations and Statement of Policy, As Amended Through February 3, 2009, http://water.state.co.us/DWRIPub/Documents/UBSCRules.pdf(last visited June 17, 2015). Therefore, UBS had the authority to completely deny Cherokeeâs export request, but it allowed the export, subject to certain conditions, including paragraph 5âs recharge requirement.Â 


 
 Â¶35Â Â Â Â Â Â  As we explained in a previous case interpreting this same stipulation, UBS and Cherokee âovercame polar opposite positionsâ in reaching this agreement. Cherokee I, 148 P.3d at 151. UBS had opposed Cherokeeâs request to export its conditional water rights for use outside of the UBS Basin, and the 1999 Stipulation represented a compromise on the part of both parties to allow Cherokee to export certain water while balancing UBSâs statutory mandate to conserve its ground water resources. Paragraph 5 of the 1999 Stipulation mitigates the effects of the export that UBS had otherwise opposed.
 
 Â¶36Â Â Â Â Â Â  We must adopt a construction of the stipulated agreement that will give effect to all of its provisions. Union Rural Elec. Assân v. Pub. Utils. Commân, 661 P.2d 247, 252 (Colo. 1983). When interpreting a contract, the court must seek âto harmonize and to give effect to all provisions so that none will be rendered meaningless.â Pepcol Mfg.Â  Co. v. Denver Union Corp., 687 P.2d 1310, 1313 (Colo. 1984). If Cherokee had the right to claim replacement credit, the stipulationâs recharge obligation would be an unnecessary and meaningless intermediary step for which UBS had no incentive to bargain. Rather, paragraph 5 was a bargained-for exchange: Cherokee agreed to return certain wastewater to the UBS Basin for recharge of the aquifer in order to secure UBSâs consent to its pending diligence application. Recharging the basin with return flows was critical to UBSâs approval of Cherokeeâs water export.[1] Any claim to use thoseÂ return flows for replacement purposes conflicts with the plain language stating that the purpose is recharge of the aquifer. As the majority points out, the purpose of recharge is to avoid or mitigate mining of the aquifer, such as is occurring in the UBS Basin.[2]Maj. op. Â¶ 17.
 
 Conclusion


 
 Â¶37Â Â Â Â Â Â  I agree with the majority that the Ground Water Commission must consider Cherokee and Meridianâs pending application as proposing ânew,â âfurther,â and âadditionalâ appropriations subject to the Ground Water Act and the Commissionâs rules. I agree with the majority that if there is available, unappropriated water in the UBS Basin, the Commission may decide to issue the parties a permit. However, to the extent that the application will cause material injury to other water users, the Commission is free to deny or condition the permit upon adequate replacement water being available. The wastewater Cherokee was already obligated to return to the UBS Basin does not constitute available replacement water because it is dedicated toÂ recharge/replenishment, under the terms of the 1999 Stipulation. I agree that the 1999 Stipulation does not preclude Meridian, who was not a party to that agreement, from claiming replacement credit for returns of its wastewater from developed, non-tributary ground water treated at Cherokeeâs wastewater treatment plant, in accordance with the terms of their intergovernmental agreement. See id. at Â¶ 1. The issue of Meridianâs claimed credit is for the Commission to determine in the exercise of its jurisdiction over applications to divert and use UBS Basin water.


 III.

 Â¶38Â Â Â Â Â Â  Accordingly, I respectfully concur in part and dissent in part.

 I am authorized to state that CHIEF JUSTICE RICE joins in this concurrence in part and dissent in part.


 [1] Correspondence between UBS and Cherokee during negotiations for the 1999 Stipulation provides evidence that UBSâs agreement to allow export of the conditional water rights was coupled with Cherokeeâs obligation to return the wastewater for recharge. For example, a September 18, 1998 letter from UBS counsel to Cherokee counsel states that âthe return flow[] must be recharged back into the basin or left in the basin and not diverted.â Cherokeeâs use of the term ârechargeâ in its negotiations shows that it was aware of the significance that UBS attached to the recharge requirement and, moreover, that it consented to delivering its return flows for recharge. Specifically, Cherokeeâs counsel acknowledged Cherokeeâs intent âto return effluent to the basin,â an arrangement that would âgreatly benefitâ the basin and comply with UBSâs statutory duty to ârecharge the ground water reservoir.â Aff. of Peter M. Susemihl, Â¶ 16, No. 98CV2331 (July 23, 1998).

 [2] The Ground Water Commission has declared the UBS Basinâs alluvial aquifer to be overappropriated. See 2 C.C.R. 410-1, Rule 5.2.6.2 (2010). This means that the Commission may permit new wells to tap this resource only when it approves a replacement plan that protects the other permitted appropriators against unreasonable injury. See Â§Â§ 37-90-103(12.7), -107.5, C.R.S. (2014).




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Supreme Court Opinions || June 22, 2015


Back